UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

| | |
|---|---|
| LUKAS PICK, Derivatively on Behalf of HALYARD HEALTH, INC., | ) Case No. |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| ROBERT E. ABERNATHY, STEVEN E. VOSKUIL, CHRIS M. LOWERY, RONALD W. DOLLENS, GARY D. BLACKFORD, JOHN P. BYRNES, HEIDI K. KUNZ, PATRICK J. O'LEARY, JULIE SHIMER, MARIA SAINZ, and WILLIAM A. HAWKINS III, | ) REDACTED VERSION FILED ) MARCH 1, 2018 |
| Defendants, | ) |
| -and- | ) |
| HALYARD HEALTH, INC., a Delaware corporation, | ) |
| Nominal Defendant. | ) DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.   Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.   This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of documents produced by Halyard Health, Inc. ("Halyard" or the "Company") in response to an inspection demand pursuant to 8 *Del. C.* §220 ("Section 220"), a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.   This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Halyard against certain of its officers and directors for violation of securities law, breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of law. These wrongs resulted in hundreds of millions of dollars in damages to Halyard's reputation, goodwill, and standing in the business community.   Moreover, these actions have exposed the Company to hundreds of millions of dollars in liability for violations of state and federal law.

2.   Halyard is a medical supply and device company focusing primarily on eliminating pain, speeding recovery, and preventing infection for healthcare providers and patients worldwide.   Before a November 2014 spin-off, the Company was the healthcare operating segment of Kimberly-Clark Corporation ("Kimberly-Clark").[1]

---

[1] Halyard entered a distribution agreement with Kimberly-Clark prior to the spin-off, wherein Halyard agreed that all legal proceedings, claims, and other liabilities primarily related to the Company's business are Halyard's responsibility.   The Company must indemnify Kimberly-Clark and hold its former parent harmless under the agreement.

3.     The Company has two business segments: (i) Medical Devices; and (ii) Surgical and Infection Prevention ("S&IP").  The Company's largest segment is S&IP, which provides healthcare supplies and solutions designed and marketed as preventing healthcare-associated infections.  S&IP accounts for nearly two-thirds of the Company's net sales, bringing in $1.01 billion out of a total $1.59 billion of revenue in fiscal year 2016.

4.     Among its chief product offerings, Halyard markets and sells MicroCool™ Breathable High Performance Surgical Gowns ("MicroCool gowns").  Starting in 2014 with the spin-off, Halyard became the primary producer and supplier of MicroCool gowns.  The Company portrayed these gowns as a breathable, yet impenetrable barrier providing healthcare providers with the highest level of protection from liquids, blood, and pathogens causing disease. The gowns were in high demand during this time as a means for healthcare providers to safely combat the spread of Ebola virus,[2] which was ravaging in Guinea, Liberia, Sierra Leone, and other West African nations.[3]

5.     Taking advantage of this heightened demand, under the supervision of the Individual Defendants (as defined herein), the Company marketed and sold the MicroCool gowns as meeting the most stringent standards of the Association for the Advancement of Medical Instrumentation ("AAMI").  The Company branded the MicroCool gowns with a performance Level 4, meaning that the gowns' impermeability made them appropriate for use in high risk situations, like the Ebola crisis.  By providing a Level 4 label, the Company brazenly

---

[2] According to the World Health Organization ("WHO"), the Ebola virus causes an acute, serious illness that is often fatal if left untreated.  It is transmitted through human-to-human transmission via direct contact with the blood, secretions, organs, or other bodily fluids of infected people.

[3] By August 2014, the WHO had declared the Ebola outbreak a public health emergency of international concern.  In the U.S., the Centers for Disease Control and Prevention, or CDC, activated its Emergency Operations Center ("EOC") for the Ebola response on July 9, 2014.  The CDC elevated the EOC to a Level 1 activation, its highest level.

claimed that the MicroCool gowns would prevent "all fluid penetration for up to 1 hour" with barrier performance "tested with a simulated blood containing a virus."

6.     In truth, the MicroCool gowns consistently failed effectiveness tests and failed to adhere to the industry standards that the Company claimed it met.   Several independent laboratories conducted these effectiveness tests and Kimberly-Clark officials confirmed the MicroCool gowns' noncompliance in internal documents prior to the spin-off.   The rigorous tests demonstrated definitively that the MicroCool gowns did not meet AAMI Level 4 standards and failed to prevent exposure to penetrating liquid, bacterial, and viral pathogens.   Despite multiple tests and confirmations from various sources, including from its former parent Kimberly-Clark, Halyard did not seek to warn healthcare providers in the U.S. and abroad of the risk of penetration by deadly pathogens or recall the defective gowns.

7.     After the spin-off, Halyard assured customers that the MicroCool gowns offered "the highest barrier protection rating available for gowns."   From October 2014 through March 2016, Individual Defendants repeatedly touted the efficacy, safety, and economic benefit of Halyard's products as supported by "a significant body of clinical evidence."   Company fiduciaries also concealed the results of the adverse testing from the U.S. Food and Drug Administration ("FDA") and the public despite the immense danger and risk the defective MicroCool gowns posed to its users, especially those in contact with the deadly Ebola virus.

8.     This wrongdoing and breaches of fiduciary duty prompted the filing of various lawsuits including a class action on behalf of consumers who purchased the Company's defective MicroCool gowns,[4] and *Qui Tam* Actions alleging violations of the Federal False Claims Act.[5]

---

[4] *Bahamas Surgery Center, LLC. et al. v. Kimberly-Clark Corp., et al.*, No. 2: 14-cv-08390-DMG-PLA (C.D. Cal. 2017) (the "Consumer Class Action") (federal jury awarding $454 million in punitive and compensatory damages in May 2017).

The Company also received subpoenas from the U.S. Department of Veterans Affairs, Office of the Inspector General ("VA OIG") seeking information related to the design, manufacture, testing, sale, and promotion of the MicroCool gowns in support of its investigation into Halyard. Yet, the wrongdoing continued, as the Company continued to sell the MicroCool gowns with an AAMI Level 4 designation.

9.       Then, on May 1, 2016, a *60 Minutes* report broadcast nationally on the CBS television network featured an interview with an inside source at the Company.  The insider, who served as the global strategic marketing director for MicroCool gowns, detailed the widespread illegal activity involving the marketing and sale of defective MicroCool gowns.  Despite knowing that the gowns were susceptible to infiltration and thus ineffective, the insider explained that the Company "went into high gear to sell the product" while the Ebola crisis was ongoing. While the Company claimed that MicroCool gowns were safe and effective at AAMI Level 4, Halyard was in possession of testing information that showed the gowns failed independent tests at shocking rates.

10.      The *60 Minutes* report further exposed that U.S. hospitals and their healthcare providers had complained about strike-throughs, or exposure to liquid, bacterial, and viral pathogens while using MicroCool gowns.  The Halyard insider revealed that Company executives expressed no concern over the complaints from healthcare providers.

11.      These events have sent Halyard's stock plunging more than 46%, or $23.46 per share.  Overall, the Company's stock plummeted from $50.41 per share on April 8, 2015 at the

---

[5] *US. ex rel. Shahinian, et al. v. Kimberly-Clark Corporation*, No. 2:l4-cv-08313-JAK-JPR (C.D. Cal. 2014) (the "First *Qui Tum* Action"); *U.S. ex rel. Kromenaker v. Kimberly-Clark Corp. and Halyard Health, Inc*., No. 1:15-cv-04413-SCJ (N. D. Ga. 2015 (the "Second *Qui Tum* Action).

height of MicroCool gown sales, to $26.95 per share on May 2, 2016 after the revelation in the *60 Minutes* report, erasing more than $1 billion in market capitalization in little over a year. Further, in addition to the lawsuits filed prior to the *60 Minutes* report, a securities class action on behalf of investors who relied on the Individual Defendants' false and misleading statements.[6] Consumers of the MicroCool gowns also filed additional class actions in the wake of the *60 Minutes* report.[7]   The U.S. Department of Justice ("DOJ") has also sent two subpoenas requesting similar information for its investigation.

12.     While the Company has significantly suffered, the same cannot be said for its fiduciaries.  Defendant Robert E. Abernathy ("Abernathy"), the Company's Chief Executive Officer ("CEO"), announced his retirement in the wake of the Company's wrongdoing.  Despite his participation in the wrongdoing described herein, defendant Abernathy received $3.8 million in total severance and retirement compensation, including cash payments and equity with accelerated vesting.

13.     Based on this information about the Individual Defendants' misconduct and illegal actions, Plaintiff sent the Company an inspection demand under Section 220 in June 2017. Plaintiff sought to investigate whether fiduciaries in the Company caused or allowed the illegal marketing and sale of defective MicroCool gowns.  After negotiations, the Company claimed to have sent the Board of Directors (the "Board") documents concerning the MicroCool gowns' compliance with AAMI Level 4 standards, the *60 Minutes* report, the advertising for the gowns,

---

[6] *Jackson v. Halyard Health, Inc. et al.*, No. 1:16-cv-05093 (S.D.N.Y. 2016).

[7] *Medline Industries, Inc. v. Kimberly-Clark Corp., Halyard Health, Inc., et al.*, No. 1:17-cv-02032 (N. D. Ga. 2017); *see also Naeryaert v. Kimberly-Clark Corp.*, No. 5:17-cv-00950 (C.D. Cal. 2017) (filed against Halyard's former parent, Kimberly-Clark, with Halyard facing potential indemnification obligations pending the resolution of *Halyard Health, Inc. v. Kimberly-Clark Corp.*, No. BC659662 (Cal. Sup. Ct – LA Cty. 2017) and *Kimberly-Clark Corp. v. Halyard Health, Inc.*, No. 2017-0332 (Del. Ch. 2017) (seeking declaratory judgment on the issue of Halyard's indemnification obligations)).

sales figures, and the review and approval of the improper statements, among other documents. The documents that the Company produced revealed that in-house counsel repeatedly updated the Board, Audit Committee, and Disclosure Committee[8] about the pending litigation matters, regulatory subpoenas, and government investigations.  Despite receiving these warnings about the MicroCool gowns, the Individual Defendants allowed the Company to continue to illegally market and sell its MicroCool as AAMI Level 4.

14.     According to the documents produced through plaintiff's inspection demand, the Board's response after the *60 Minutes* report was equally deficient.  Particularly, in-house and outside counsel briefed the Board only once on the quality assurance process at Halyard █

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

15.     In addition, defendants Abernathy, Voskuil, Gary D.  Blackford ("Blackford"), John Byrnes ("Byrnes"), Ronald W. Dollens ("Dollens"), William A. Hawkins III ("Hawkins"), Heidi K. Kunz ("Kunz"), Patrick J. O'Leary ("O'Leary"), Maria Sainz ("Sainz"), and Julie Shimer ("Shimer") negligently made false and misleading statements in the Company's 2016 Proxy Statement on Form DEF 14A filed with the SEC (the "2016 Proxy").  The 2016 Proxy was filed ahead of the Company's Annual Stockholders Meeting.  The 2016 Proxy included votes on the

---

[8] According to the Company's Proxy Statement on Form DEF 14A filed with the SEC on March 16, 2015, the Disclosure Committee was formed in 2014 to assist the Board in maintaining disclosure controls and procedures and oversee the process of preparing the Company's SEC filings.   The Disclosure Committee is composed of members of management, including defendant Steven E. Voskuil ("Voskuil").

election of Halyard's Board, including defendants Byrnes, Sainz, and Shimer in 2016, as well as votes to approve performance metrics as part of an equity participation plan targeting Halyard employee, including top executives.  In connection with these efforts, the above members of the Board misleadingly stated that they engaged in proper corporate governance, operational risk oversight, and that the Audit Committee exercises oversight of the Company's financial statement.

16.     Plaintiff thus brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

17.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

18.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this Court in accordance with section 27 of the Exchange Act and 28 U.S.C. §1331.  Halyard is incorporated in this District with a forum selection provision that specifies that if all of the state courts of Delaware lack subject matter jurisdiction (as they do here, given the exclusive jurisdiction vested in the federal courts over the federal claims asserted herein), then the sole and exclusive forum for certain legal actions involving the Company,

including those for breach of fiduciary duty, shall be the U.S. District Court for the District of Delaware.

## THE PARTIES

**Plaintiff**

20.     Plaintiff Lukas Pick was a stockholder of Halyard at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Halyard stockholder.

**Nominal Defendant**

21.     Nominal defendant Halyard is a Delaware corporation with principal executive offices located at 5405 Windward Parkway, Suite 100 South, Alpharetta, Georgia.  Halyard is a medical technology company that provides products and solutions in pain management, digestive health, infection prevention and surgical solutions.  As of December 31, 2016, the Company had approximately 12,000 employees.

**Defendants**

22.     Defendant Abernathy was Halyard's CEO from October 2014 to June 2017 and Chairman of the Board and a director from October 2014 to September 2017.   Defendant Abernathy was also Kimberly-Clark's President Global Health Care from June 2014 to October 2014; Executive Vice President from November 2013 to June 2014; Group President—Europe, Global Nonwovens, and Continuous Improvement & Sustainability from November 2012 to November 2013; Group President—North Atlantic Consumer Products from March 2008 to November 2012; Group President—Developing Emerging Markets from January 2004 to March 2008; and held various other positions with Kimberly-Clark beginning in 1982.  Defendant Abernathy was a member of the Executive Committee from at least March 2015 to at least

March 2017.  Defendant Abernathy is also named in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").  Defendant Abernathy knowingly, recklessly, or with gross negligence: (i) caused or allowed Halyard to engage in illegal practices in connection with the sales and marketing of the Company's defective MicroCool gowns; (ii) caused or allowed Halyard to disseminate improper statements concerning the potential heightened legal scrutiny on the Company's sales and marketing of its defective MicroCool gowns; and (iii) failed to maintain adequate internal controls over its financial reporting or adequate disclosure procedures with respect to Halyard's operations and risk management. Defendant Abernathy also negligently made materially misleading statements in the Company's 2016 Proxy.  Halyard paid defendant Abernathy the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|-------------------------|------------------------|-------|
| 2016 | $837,375 | $2,465,829 | $1,199,999 | $1,400,091 | - | $55,752 | $5,959,046 |
| 2015 | $837,375 | $1,800,021 | $2,699,994 | $161,613 | - | $96,755 | $5,595,758 |
| 2014 | $787,500 | $3,700,828 | $508,375 | $708,516 | $1,024,198 | $161,189 | $6,890,606 |

23.     Defendant Voskuil is Halyard's Senior Vice President and Chief Financial Officer ("CFO") and has been since October 2014.  Defendant Voskuil is a member of the Disclosure Committee and has been since October 2014.  Defendant Voskuil was also Kimberly-Clark International's Vice President—Finance from September 2011 to October 2014; Kimberly-Clark's Vice President and Treasurer from January 2008 to September 2011; and held various other positions with Kimberly-Clark beginning in 1991.  Defendant Voskuil is named in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and Securities Act.  Defendant Voskuil knowingly, recklessly, or with gross negligence: (i) caused or allowed Halyard to engage in illegal practices in connection with the

sales and marketing of the Company's defective MicroCool gowns; (ii) caused or allowed Halyard to disseminate improper statements concerning the potential heightened legal scrutiny on the Company's sales and marketing of its defective MicroCool gowns; and (iii) failed to maintain adequate internal controls over its financial reporting or adequate disclosure procedures with respect to Halyard's operations and risk management.  Defendant Voskuil also negligently made materially misleading statements in the Company's 2016 Proxy.  Halyard paid defendant Voskuil the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|-------------------------|------------------------|-------|
| 2016 | $436,450 | - | $657,562 | $319,997 | $510,821 | - | $45,916 | $1,970,746 |
| 2015 | $436,450 | - | $465,732 | $697,949 | $58,964 | - | $75,784 | $1,734,879 |
| 2014 | $367,496 | $150,000 | $1,357,579 | $808,736 | $221,078 | $46,809 | $44,577 | $2,996,275 |

24.     Defendant Chris Lowery ("Lowery") was Halyard's Senior Vice President and Chief Operating Officer ("COO") from October 2014 to December 2017.  Defendant Lowery was also Kimberly-Clark's Vice President, Global Health Care Sales and Marketing from July 2013 to October 2014, and Vice President, Global Medical Devices from 2010 to July 2013. Defendant Lowery knowingly, recklessly, or with gross negligence: (i) caused or allowed Halyard to engage in illegal practices in connection with the sales and marketing of the Company's defective MicroCool gowns; (ii) caused or allowed Halyard to disseminate improper statements concerning the potential heightened legal scrutiny on the Company's sales and marketing of its defective MicroCool gowns; and (iii) failed to maintain adequate internal controls over its financial reporting or adequate disclosure procedures with respect to Halyard's operations and risk management. Halyard paid defendant Voskuil the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2016 | $482,125 | - | $863,029 | $419,997 | $685,196 | $31,262 | $2,481,609 |
| 2015 | $482,125 | - | $604,232 | $902,739 | $79,093 | $42,381 | $2,110,570 |
| 2014 | $332,667 | $250,000 | $1,156,670 | $535,857 | $200,185 | $32,815 | $2,508,194 |

25.     Defendant Dollens is Halyard's Lead Director and a director and has been since October 2014.  Defendant Dollens knowingly or recklessly: (i) caused or allowed Halyard to engage in illegal practices in connection with the sales and marketing of the Company's defective MicroCool gowns; (ii) caused or allowed Halyard to disseminate improper statements concerning the potential heightened legal scrutiny on the Company's sales and marketing of its defective MicroCool gowns; and (iii) failed to maintain adequate internal controls over its financial reporting or adequate disclosure procedures with respect to Halyard's operations and risk management.  Defendant Dollens also negligently made materially misleading statements in the Company's 2016 Proxy.  Halyard paid defendant Dollens the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|-------------|-------------------|--------------|-------|
| 2016 | $90,000 | $140,000 | $230,000 |
| 2015 | $90,000 | $140,000 | $230,000 |

26.     Defendant Blackford is a Halyard director and has been since October 2014.  Defendant Blackford is also a member of Halyard's Audit Committee and has been since at least November 2014.  Defendant Blackford knowingly or recklessly: (i) caused or allowed Halyard to engage in illegal practices in connection with the sales and marketing of the Company's defective MicroCool gowns; (ii) caused or allowed Halyard to disseminate improper statements concerning the potential heightened legal scrutiny on the Company's sales and marketing of its defective MicroCool gowns; and (iii) failed to maintain adequate internal controls over its

financial reporting or adequate disclosure procedures with respect to Halyard's operations and risk management.  Defendant Blackford also negligently made materially misleading statements in the Company's 2016 Proxy.  Halyard paid defendant Blackford the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $85,000 | $140,000 | $225,000 |
| 2015 | $70,000 | $140,000 | $210,000 |

27.     Defendant Byrnes is a Halyard director and has been since October 2014. Defendant Byrnes is also a member of the Compliance Committee and has been since at least March 2016.  Defendant Byrnes knowingly or recklessly: (i) caused or allowed Halyard to engage in illegal practices in connection with the sales and marketing of the Company's defective MicroCool gowns; (ii) caused or allowed Halyard to disseminate improper statements concerning the potential heightened legal scrutiny on the Company's sales and marketing of its defective MicroCool gowns; and (iii) failed to maintain adequate internal controls over its financial reporting or adequate disclosure procedures with respect to Halyard's operations and risk management.  Defendant Byrnes also negligently made materially misleading statements in the Company's 2016 Proxy.  Halyard paid defendant Byrnes the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $70,000 | $140,000 | $210,000 |
| 2015 | $70,000 | $140,000 | $210,000 |

28.     Defendant Kunz is a Halyard director and has been since October 2014. Defendant Kunz is also the Chairman of Halyard's Audit Committee and a member of that committee and has been since at least November 2014.  Defendant Kunz knowingly or recklessly: (i) caused or allowed Halyard to engage in illegal practices in connection with the

sales and marketing of the Company's defective MicroCool gowns; (ii) caused or allowed Halyard to disseminate improper statements concerning the potential heightened legal scrutiny on the Company's sales and marketing of its defective MicroCool gowns; and (iii) failed to maintain adequate internal controls over its financial reporting or adequate disclosure procedures with respect to Halyard's operations and risk management.  Defendant Kunz also negligently made materially misleading statements in the Company's 2016 Proxy.  Halyard paid defendant Kunz the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2016 | $85,000 | $140,000 | $225,000 |
| 2015 | $85,000 | $140,000 | $225,000 |

29.    Defendant O'Leary is a Halyard director and has been since October 2014. Defendant O'Leary is also a member of Halyard's Audit Committee and has been since at least November 2014.  Defendant O'Leary knowingly or recklessly: (i) caused or allowed Halyard to engage in illegal practices in connection with the sales and marketing of the Company's defective MicroCool gowns; (ii) caused or allowed Halyard to disseminate improper statements concerning the potential heightened legal scrutiny on the Company's sales and marketing of its defective MicroCool gowns; and (iii) failed to maintain adequate internal controls over its financial reporting or adequate disclosure procedures with respect to Halyard's operations and risk management.  Defendant O'Leary also negligently made materially misleading statements in the Company's 2016 Proxy.  Halyard paid defendant O'Leary the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2016 | $70,000 | $140,000 | $210,000 |
| 2015 | $70,000 | $140,000 | $210,000 |

30.     Defendant Shimer is a Halyard director and has been since October 2014. Defendant Shimer is also a member of the Compliance Committee and has been since at least March 2016.  Defendant Shimer knowingly or recklessly: (i) caused or allowed Halyard to engage in illegal practices in connection with the sales and marketing of the Company's defective MicroCool gowns; (ii) caused or allowed Halyard to disseminate improper statements concerning the potential heightened legal scrutiny on the Company's sales and marketing of its defective MicroCool gowns; and (iii) failed to maintain adequate internal controls over its financial reporting or adequate disclosure procedures with respect to Halyard's operations and risk management.  Defendant Shimer also negligently made materially misleading statements in the Company's 2016 Proxy.  Halyard paid defendant Shimer the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $85,000 | $140,000 | $225,000 |
| 2015 | $85,000 | $140,000 | $225,000 |

31.     Defendant Sainz is a Halyard director and has been since February 2015. Defendant Sainz is also a member of the Compliance Committee and has been since at least March 2016.  Defendant Sainz knowingly or recklessly: (i) caused or allowed Halyard to engage in illegal practices in connection with the sales and marketing of the Company's defective MicroCool gowns; (ii) caused or allowed Halyard to disseminate improper statements concerning the potential heightened legal scrutiny on the Company's sales and marketing of its defective MicroCool gowns; and (iii) failed to maintain adequate internal controls over its financial reporting or adequate disclosure procedures with respect to Halyard's operations and risk management.  Defendant Sainz also negligently made materially misleading statements in the Company's 2016 Proxy.  Halyard paid defendant Sainz the following compensation as a

director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2016 | $70,000 | $140,000 | $210,000 |
| 2015 | $70,000 | $140,000 | $210,000 |

32.     Defendant Hawkins is a Halyard director and has been since December 2015. Defendant Hawkins is also the Chairman of Halyard's Compliance Committee and a member of that committee and has been since at least March 2016.  Defendant Hawkins knowingly or recklessly: (i) caused or allowed Halyard to engage in illegal practices in connection with the sales and marketing of the Company's defective MicroCool gowns; (ii) caused or allowed Halyard to disseminate improper statements concerning the potential heightened legal scrutiny on the Company's sales and marketing of its defective MicroCool gowns; and (iii) failed to maintain adequate internal controls over its financial reporting or adequate disclosure procedures with respect to Halyard's operations and risk management.  Defendant Hawkins also negligently made materially misleading statements in the Company's 2016 Proxy.  Halyard paid defendant Hawkins the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2016 | $85,000 | $140,000 | $225,000 |

33.     The defendants identified in ¶¶22-24 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶22, 25-32 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶26, 28, 29 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶27, 30-32 are referred to herein as the "Compliance Committee Defendants."  Collectively, the defendants identified in ¶¶22-32 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

34.     By reason of their positions as officers and directors of Halyard, each of the Individual Defendants owed and owe Halyard and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Halyard in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Halyard and not in furtherance of their personal interest or benefit.

35.     To discharge their duties, the officers and directors of Halyard were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of Halyard.  By virtue of such duties, the officers and directors of Halyard were required to, among other things:

(a)     conduct the affairs of Halyard in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b)     remain informed as to how Halyard conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(c)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in deceptive conduct.

**Halyard's Code of Conduct**

36.     The Company implemented a Code of Conduct (the "Code"), last promulgated February 17, 2016.  The Code applies to all directors, officers, and employees of the Company. Under the Code, the Individual Defendants must "never compromise product quality or safety." The Codes states the following:

> You should never compromise product quality or safety.
>
> • Halyard Health's reputation for product safety and quality is one of our most valuable assets.  We are committed to providing products that are safe and please our customers.
>
> • The health, safety and well-being of healthcare professionals and patients are our primary concern.  We will meet or exceed legal and regulatory requirements and industry standards for product safety and quality.  We work every day to earn the trust of our healthcare professionals and patients through all our actions and decisions.
>
> • We are committed to producing safe, high quality products across all of our brands.  We maintain the trust of our customers by designing and manufacturing superior products, starting with the purchase of our raw ingredients and continuing until the finished product is used by the customer.
>
> • Each one of us plays a role in providing our healthcare professionals and patients with the safe, high quality products they expect.  Know the quality standards, policies, and procedures that apply to the products and activities at your location.
>
> • Never do anything that could undermine the trust that our customers place in us or could compromise the quality or safety of our products.
>
> • If you see something that could negatively affect the quality or safety of a Halyard Health product, speak up and report it immediately to your team leader or your facility, business unit or corporate quality/ product safety department.

**Additional Duties of the Audit Committee Defendants**

37.     In addition to these duties, the Audit Committee Defendants, defendants Blackford, Kunz, and O'Leary, owed specific duties to Halyard to assist the Board in overseeing the Company's compliance with legal and regulatory requirements and the financial filings with

the SEC, as well as legal matters that may have a material impact on the financial statements.

The Audit Committee is further charged with discussing significant risk areas and the steps

management has taken to monitor, control, and report such exposures to the full Board.

Additionally, the Audit Committee has the duty to meet with management to discuss any

litigation matters.  Further, the Audit Committee is tasked with reviewing and approving the

Company's filings with the SEC, and preparing required reports in the Company's proxy

statements.  The Audit Committee Charter, adopted October 7, 2014, states:

> The Audit Committee shall take appropriate actions to ensure a management environment for quality financial reporting, sound business risk practices, and ethical behavior.

> \* \* \*

> Review management's assertion on its assessment of the effectiveness of internal controls as of the end of the most recent fiscal year.  Review and discuss with management and the independent auditors any significant issues as to the adequacy of the Corporation's internal controls, the adequacy of disclosures about internal controls over financial reporting, and the independent auditors' report on the Corporation's effectiveness of internal controls.

> \* \* \*

> Provide oversight of the Corporation's compliance programs relating to financial matters and receive periodic reports from management on compliance program effectiveness and significant issues relating to the following compliance areas: Accounting Controls, Anti-Fraud, Books and Records, Financial Statements, Public Disclosures, Taxes, and any other financial compliance areas not identified in the Compliance Committee's charter.  At least annually, the Committee shall coordinate with the Compliance Committee to discuss matters of mutual interest within the context of each Committee's respective responsibilities.

> \* \* \*

> Meet, at least annually, with management to discuss, as appropriate, significant accounting accruals, estimates and reserves; litigation matters; management's representations to the independent auditors; new or proposed regulatory accounting and reporting rules; any significant off- balance sheet transactions and variable interest entities; and any significant financial reporting issues or judgments disputed with the Corporation's independent auditors.

- 18 -

Provide oversight of the Corporation's risk management program and receive periodic reports from management on risk assessments, the risk management process and issues related to the risks of managing the Corporation's business, including information technology, hedging, insurance, and tax matters.

Review with the Corporation's general counsel legal matters that may have a material impact on the financial statements.

**Additional Duties of the Compliance Committee Defendants**

38.     The Compliance Committee Defendants, defendants Byrnes, Hawkins, Sainz, and

Shimer, are charged with overseeing and monitoring matters "relating to the Corporation's

compliance with applicable laws and regulations throughout the world ("Compliance") other than

those relating to matters reserved for the Audit Committee," and "matters relating to

sustainability, corporate social responsibilities and corporate citizenship."   According to the

Compliance Committee Charter, the Compliance Committee shall:

1. Provide oversight and monitoring of Compliance matters, provided that the Audit Committee shall have sole oversight over compliance programs relating to financial matters, including auditing, financial reporting, and disclosures to investors.

2. Provide oversight and monitoring of the following areas of the Corporation's Compliance program and receive periodic reports from management on such areas:

· Code of Conduct
· Conflicts of Interest
· Consumer Protection
· Ethics
· Environment
· Government Relations
· Health and Safety
· Interactions with Healthcare Professionals
· Customs and Export Controls
· False Claims
· Foreign Corrupt Practices Act and Similar Anti-Bribery Laws
· Fraud and Abuse Laws including Anti-Kickback
· Government Reimbursement Programs, including Medicare

· Information Systems Security
· Intellectual Property
· Labor & Employment
· Physical Security
· Quality
· Recalls
· Regulatory including FDA
· Safety
· Sales of Products or Services to US or Foreign Governments, including entities owned by such governments
· Sunshine Act and Other Laws Relating to Reporting of and Transparency with Respect to Payments to Healthcare Professionals
· Transportation.

3. Provide oversight of the Corporation's sustainability, corporate social responsibility and corporate citizenship matters and receive periodic reports from management on such programs and their effectiveness.

4. Monitor the Corporation's efforts to implement programs, policies and procedures relating to Compliance matters, and the training of employees and others on such matters.

5. Review the results of compliance related audits conducted by the Corporation and by the FDA or other regulators.

6. Request or oversee the investigation of any significant instances or potential instances of noncompliance with laws or the Corporation's Compliance programs, policies or procedures; provided, however, that any instances or potential instances of financial noncompliance shall be directed to the Audit Committee for investigation.

7. Review on a regular basis litigation matters filed against the Corporation related to alleged violations of laws and regulations.

8. Review on a regular basis the Corporation's Compliance risk assessment plan.

9. At least annually, the Compliance Committee shall coordinate with the Audit Committee to discuss matters of mutual interest within the context of each Committee's respective areas of oversight.

10. Identify and investigate emerging Compliance issues and trends which may affect the Corporation.

11. Periodically review the Corporation's compliance oversight structure and the allocation of resources and responsibilities across the organization.

12. In consultation with the Governance Committee, conduct an annual evaluation of the performance and effectiveness of the Compliance Committee and report the results of that evaluation to the Board.

13. Have such other duties and oversight and monitoring responsibilities as may be assigned to the Compliance Committee, from time to time, by the Board and/or the Chairman of the Board.

**Control, Access, and Authority**

39.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Halyard, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

40.     Because of their advisory, executive, managerial, and directorial positions with Halyard, each of the Individual Defendants had access to adverse, nonpublic information about the financial condition, operations, and improper representations of Halyard, including information regarding the several factors negatively impacting the Company's performance.

41.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Halyard, and was at all times acting within the course and scope of such agency.

**Breaches of Duties**

42.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its stockholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Halyard, the absence of good faith on their part, and

a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

43.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in improper practices, including the marketing and sales of MicroCool surgical gowns that repeatedly failed tests that evaluated their ability to prevent penetration of liquid, bacterial and viral pathogens and making improper statements to the public and Halyard's stockholders, that wasted the Company's assets that resulted in myriad lawsuits and hundreds of millions of dollars in settlements that caused and continue to cause Halyard to incur substantial damage.

44.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Halyard, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Halyard has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

45.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

46.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal harmful

information relating to Halyard's MicroCool gowns that rendered statements in the Company's SEC filings and public announcements improper; (ii) deceive the investing public, including stockholders of Halyard, regarding the Individual Defendants' management of Halyard's operations and oversight of risk; and (iii) enhance the Individual Defendants' executive and directorial positions at Halyard and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

47.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused Halyard to issue improper financial statements.

48.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning Halyard's operations, financial condition, and future business prospects.

49.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing Halyard to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

50.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and MicroCool Gowns**

51.     Halyard is a medical technology company focused on developing and delivering products and solutions in infection prevention, surgical solutions, respiratory health, digestive health, pain management, and IV therapy.  Halyard was the health care operating segment of Kimberly-Clark until 2014 when it was spun off as a separate publicly-traded company.  The Company operates two primary segments, S&IP and Medical Devices.  S&IP provides healthcare supplies and solutions that target the prevention of healthcare-associated infections, including sterilization wrap, surgical wrap, surgical drapes and gowns, facial protection, protective apparel, and medical exam gloves.  The segment produces the majority of the Company's revenue, constituting over $1 billion of Halyard's total $1.59 billion in net sales for the fiscal year 2016, according to the Company's most recent Annual Report on Form 10-K filed with the SEC on February 27, 2017.

52.     Since the spin-off in 2014, Halyard has become the primary producer and supplier of certain protective medical equipment and supplies needed for the prevention of the Ebola virus in Guinea, Liberia, Sierra Leone, and other West African nations.  One of Halyard's most noteworthy and demanded products to combat the spread of Ebola was the MicroCool gowns, part of the Company's S&IP segment.

53.     The MicroCool gowns, like all surgical gowns, are "medical devices" subject to FDA regulation.  Because medical devices are used by surgeons, nurses, and technicians in fluid intensive procedures (i.e., procedures that risk exposure to significant amounts of blood and pathogens), the most important aspect of these medical devices is their liquid barrier protection.

54.     Under FDA Regulation 820, 21 C.F.R. §820, Halyard is required to maintain the safety and efficacy of its finished products in compliance with the Federal Food, Drug, and Cosmetic Act.  In particular, when the results of a process for quality control "cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures."  *See* 21 C.F.R. §820.75. Furthermore, "[e]ach manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met."  *Id*.  Regulation 820 holds:

(a) Where the results of a process cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures. The validation activities and results, including the date and signature of the individual(s) approving the validation and where appropriate the major equipment validated, shall be documented.

(b) Each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met.

(1) Each manufacturer shall ensure that validated processes are performed by qualified individual(s).

(2) For validated processes, the monitoring and control methods and data, the date performed, and, where appropriate, the individual(s) performing the process or the major equipment used shall be documented.

(c) When changes or process deviations occur, the manufacturer shall review and evaluate the process and perform revalidation where appropriate. These activities shall be documented.

55.     The AAMI is the industry standard recognized by the FDA for measuring the level of liquid barrier protection that a surgical gown provides.  The AAMI (PB70) standard is a four-level hierarchy of surgical protection that gives medical professionals guidance as to which gown they should purchase for a given situation. AAMI performance levels range from Level 1 (least protective) to Level 4 (most protective).  AAMI Level 1 is to be used in "MINIMAL risk situations" providing only a "slight barrier" to fluid penetration. Levels 2 and 3 are to be used in "LOW" and "MODERATE" risk situations and involve distinct tests to determine fluid penetration and barrier protection.  Level 4 is to be used in "HIGH risk situations" and thus must prevent "all fluid penetration for up to 1 hour" with barrier performance "tested with a simulated blood containing a virus."

56.     For a surgical gown to qualify as AAMI Level 4, it must pass the American Society for Testing and Material ("ASTM") protocol test for the "critical zones."  The "critical zones" refer to the areas on the front of the gown that are most likely to be exposed to fluids. The "critical zones" are the sleeve seams and the front body.  The ASTM (1671) test is conducted by placing a solution of simulated blood and virus particles on the outside of the gown and pressurized at specified tolerances for specified time periods to see if the blood or virus material passes through the surgical gown.  If no simulated blood or virus material passes through the gown, then it is a pass for that sample.

57.     Halyard introduced the Level 4 MicroCool gowns in 2011 while it was under the ownership of Kimberly-Clark.  Kimberly-Clark represented to the FDA that the MicroCool gowns met the requirements for Level 4 of the AAMI liquid barrier protection test. Kimberly-Clark stated the following in a 510(k) submission to the FDA:

> The Kimberly-Clark * MicroCool* Breathable High Performance Surgical Gowns, are sterile, single use surgical apparel intended to be worn by healthcare

professionals to help protect both the patient and the healthcare worker from the transfer of microorganisms, body fluids, and particulate matter.  The MicroCool Breathable High Performance Surgical Gowns meet the Level 4 requirements of the AAMI Liquid Barrier classifications.

* * *

The Kimberly-Clark * MicroCool* Breathable High Performance Surgical Gowns, have been tested in compliance with the requirements of Level 4 liquid barrier performance requirements of ANSI/AAMI PB70;2003 "*Liquid barrier performance and classification of protective apparel and drapes intended for use in health care facilities.* "The MicroCool* Breathable High Performance Surgical Gown also meets the requirements of ASTM 1671:2003 *Standard test method for resistance of materials used in protective clothing to penetration by blood-born pathogens using Phi-X174 bacteriophage penetration as a test system.* The MicroCool* Breathable High Performance Surgical Gown also meets the requirements of Flame Resistant CPSC 1610 Class 1.  The MicroCool* Breathable High Perfomance Surgical Gown has also been tested in compliance with the biocompatibility requirements of ISO 10993 for surface devices with limited contact with breached or compromised surfaces.  All results of testing met acceptance criteria.

58.      In addition to the representations made to the FDA, Kimberly-Clark also made positive statements to the public promoting the MicroCool gowns' safety and capabilities.  For example, in a May 16, 2011 press release introducing the MicroCool gowns, Kimberly-Clark stated the gowns passed the AAMI Level 4 standards for liquid barrier protection.  Kimberly-Clark further stated that the "gown helps prevent blood and other bodily fluids from penetrating through to the clinicians skin during any procedure and is specifically designed for the most demanding and fluid-intensive procedures."

59.      Also in the press release, Kimberly-Clark's Vice President of Global Sales and Marketing, John Amat, was quoted as saying "[t]he gown delivers surgeons and surgical staff a full spectrum of protection and the assurance of barrier integrity, allowing them to concentrate solely on patient care during long and stressful procedures and not on their risk of exposure."

**MicroCool Gowns Experience Problems During Testing**

60.     Unfortunately, the MicroCool gowns were not as effective or safe as Kimberly-Clark advertised and their defects were soon exposed when the gowns repeatedly failed tests that evaluated their ability to prevent penetration of liquid, bacterial, and viral pathogens.   Such results came to light through independent tests commissioned by Kimberly-Clark.   On February 29, 2012, an independent testing lab, Intertek Group plc ("Intertek"), tested the MicroCool gowns and found that the gowns did not pass the standards for AAMI Level 4.   The MicroCool gowns were then tested by SGS Integrated Paper Services ("IPS Testing"), another lab, which conducted monitoring tests each month on the gowns in 2012.   IPS Testing's tests reached the same conclusion, finding that the MicroCool gowns did not meet AAMI Level 4 standards.

61.     In January 2013, Cardinal Health, Inc. ("Cardinal Health") shared test results of the MicroCool gowns with Kimberly-Clark during litigation between the two companies. Cardinal Health commissioned the test, which showed that the MicroCool gowns were failing at an alarming rate.   Specifically, the tests performed by Intertek in December 2012, showed that forty-eight out of ninety-six of the tested MicroCool gowns (picked from three separate manufacturing lots) failed to meet AAMI Level 4 standards.

62.     Further, thirty-two of those tested gowns experienced catastrophic failures.   The MicroCool gowns failed yet again on February 23, 2013, when Kimberly-Clark sent another lot of the gowns to Intertek for testing.   Of the eighty-five samples tested at Intertek, eighteen (or 21.12%) had failed to meet the AAMI Level 4 standards.

63.     The testing failures of the MicroCool gowns were also confirmed by Keith Edgett ("Edgett"), Kimberly-Clark's Global Director of Surgical and Infection Prevention.   According to Edgett, during his tenure at the company between March 2011 and October 2013, Kimberly-Clark was well aware that the MicroCool gowns were not compliant.   The failures were so

common that Edgett suggested that no more AAMI testing be performed and that a scientist who reported to him should travel to Honduras (where the gowns were manufactured) in an attempt to try and figure out why the failures were occurring. Kimberly-Clark's quality division, likewise, recognized the MicroCool gowns "failed" AAMI Level 4 testing and therefore could not be represented as being AAMI Level 4. Joanne Bauer (the President of Kimberly-Clark's Healthcare division at the time) subsequently convened a meeting about AAMI noncompliance. Edgett described the meeting as follows:

> The - what I would categorize as the - most significant experience for me occurred in late 2012, early 2013, where we were in a meeting with Joanne, all of her direct reports were in the room, there were a number of others that would be my colleagues that held director titles. I'd say there were somewhere between 18 and 25 people in the boardroom.

> And at one point in the discussion Joanne looked at me, and she was emotional, and stated that she was sick and tired of all the noncompliance issues . . . that she had experienced for more than a decade, and she wanted me to fix it.

64. Kimberly-Clark thus formed a "Fast Solution Team" in which Edgett was "asked to lead a team to resolve our current AAMI issues" which would report back to Ms. Bauer on a weekly basis. This team later confirmed that the MicroCool gowns were noncompliant and the fact had been well known within Kimberly-Clark. Kimberly-Clark subsequently initiated a Corrective and Preventative Action ("CAPA") to resolve the known problems with the MicroCool gowns.

65. Importantly, when Kimberly-Clark initiated the CAPA in February 2013, it admitted in its internal documents that the "problem" was that the gowns "are not meeting the AAMI Standard requirement as required in ASTM 1670 and the 510(k)" because the "[c]urrent Band [sic] Sealing technology of gown sleeves is inadequate to meet the AAMI requirement for barrier performance."

66.     By the end of 2013, Kimberly-Clark's quality department acknowledged that the bar "sealing technology of gown sleeves is inadequate to meet the AAMI requirement for barrier performance."  Kimberly-Clark's testing failures were consistent with the feedback that it was hearing from purchasers of the MicroCool gowns.  Sales representatives were routinely receiving complaints about the gowns, particularly strike-through, or blood getting through the gowns and onto the skin, and leaking in the sleeve area.  One Kimberly-Clark sales representative wrote on August 22, 2012, that the sleeves "pull apart pretty easily" and wondered if "there is any way to make them stronger."

**Halyard Continues to Sell the MicroCool Gowns After the Spin-Off**

67.     After the spin-off, Halyard became the sole provider of the MicroCool gowns. Instead of fixing the failures with the MicroCool gowns or initiating a recall to ensure the integrity and safety of the gowns, Halyard continued to aggressively market the product and even emphasized its safety features, advertising the gowns on its website as offering "the highest barrier protection rating available for gowns."

68.     Halyard repeatedly assured the public that its MicroCool gowns were the same exact MicroCool gowns that Kimberly-Clark manufactured, just under a different name and packaging.  According to a post on Halyard's website entitled "Surgical Solutions Package Change Guide," the branding, labeling, packaging, and documentation for all of the Kimberly-Clark's products gowns, drapes, equipment covers and accessories were changed from Kimberly-Clark to Halyard.  However, the actual product and product codes remained the same.  As Halyard declared on its website post, "You'll continue to receive the SAME product, with the SAME CODES from the SAME PLANTS."

69.     Demand for the MicroCool gowns greatly increased as awareness of the Ebola epidemic grew in 2014.  Halyard consistently promoted the MicroCool gowns as being the best gowns possible to protect against diseases like Ebola.  During the relevant period, the Company has sold approximately thirteen million MicroCool gowns annually worldwide.

**The Company Is Plagued with Lawsuits and Investigations Related to the Illegal Marketing and Sale of Defective MicroCool Gowns**

70.     During the relevant period, Halyard was hit with a series of lawsuits over its false claims and defective products.  A whistleblower filed the First *Qui Tam* Action under seal against the Company, on October 27, 2014.  In the First *Qui Tam* Action, plaintiff alleged that the Company violated the Federal False Claims Act, 31 U.S.C. §3729, *et seq*., and parallel state law false claims provisions in connection with the marketing and sale of the MicroCool gowns.

71.     This suit was followed by the Consumer Class Action.  The plaintiff in the Consumer Class Action brought the case for the Company's false representations that the MicroCool gowns provided the highest level of liquid barrier protection.

72.     The Company also faces fines and other punishment from the federal government.  The Company has been served with subpoenas from the VA OIG in June 2015, seeking information related to the design, manufacture, testing, sale, and promotion of not only MicroCool surgical gowns, but all the Company's gowns.

73.     A second whistleblower filed an additional *qui tam* action against Halyard on December 21, 2015, the Second *Qui Tam* Action.  Similar to the First *Qui Tam* Action, the whistleblower in the Second *Qui Tam* Action alleges violations of the Federal False Claims Act,

31 U.S.C. §3729, *et seq.*, and parallel state law false claims provisions in connection with the marketing and sale of the MicroCool gowns.

**Plaintiff's Inspection Demand Exposes the Board's Knowledge of and Failure to Address Wrongdoing**

74.     After Halyard's illegal marketing and sales of defective MicroCool gowns were exposed to the public, plaintiff sent the Company an inspection demand under Section 220 to investigate whether fiduciaries in the Company breached their duties.

75.     As part of plaintiff's sixth demand for inspection, he requested all Board documents concerning the MicroCool gowns' compliance with AAMI Level 4 standards, the *60 Minutes* report, the advertising for the gowns, sales figures, and the review and approval of the improper statements, as well as any communication with a governmental agency regarding the MicroCool gowns, including the DOJ, SEC, or FDA.  The Company claimed that it sent all the documents responsive to the inspection demand that plaintiff requested.

76.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

77.



78.

79.      Based on the lack of Board documents provided in plaintiff's inspection demand, the Board ignored, recklessly disregarded, or failed to provide adequate oversight over the illegal marketing and sale of the MicroCool gowns, which did not adequately protect users against dangerous and life-threatening pathogens causing disease.    In fact, even faced with several consumer class actions, *qui tam* actions, and a subpoena in the course of a VA OIG investigation, the Board did not address the issues related to defective MicroCool gowns, or even conduct an investigation until the *60 Minutes* broadcast _____ spurred it to act.

**The Individual Defendants Caused Halyard to Make False and Misleading Statements During the Relevant Period**

80.     Beginning in 2014, the Individual Defendants made repeated improper statements claiming that its products, including the MicroCool gowns, were safe and effective based on a "significant body of clinical evidence," thus inflating sales of the noncompliant and defective gowns.   The Individual Defendants also erroneously assured in its public statements that the Board was "uphold[ing] sound governance practices," had effective internal controls over its oversight of the safety and efficacy of its products, and had adequate disclosure controls and procedures.   These statements were not true, however, as the Board and its Committees allowed the Company to claim that the MicroCool gowns offered "the highest barrier protection" at the height of the international Ebola outbreak while never acknowledging the alarming number of the gowns that had failed to provide even moderate liquid barrier protection.   Many gowns, however, were so defective that they actually fell apart at the seams, potentially exposing healthcare providers to dangerous and life-threatening pathogens causing disease.   As explained further below,

Instead, the Individual Defendants allowed the sales and improper marketing of the MicroCool gowns to continue.

81.     On October 21, 2014, two days before the spin-off, Halyard filed a Current Report on Form 8-K with the SEC announcing the financial and operating results for the third fiscal quarter ended September 30, 2014 (the "Q3 2014 Form 8-K").   For the third fiscal quarter, Halyard reported net sales of $279.2 million for its S&IP segment, compared to net sales of $287

million for the same period in the prior year.  Attached as an exhibit to the Form 8-K was a letter to Halyard stockholders, which identified the MicroCool gowns as one of Halyard's "more important marks."  In the Form 8-K, the Company also stated that its MicroCool gowns are "*innovative, cost-effective and high quality products*."

82.



83.     On November 20, 2014, Halyard filed a Quarterly Report on Form 10-Q with the SEC for the third fiscal quarter (the "Q3 2014 Form 10-Q"), one month after the spin-off. Defendants Abernathy and Voskuil signed the Q3 2014 10-Q.  The Q3 2014 10-Q reiterated the financial and operating results previously announced in the Q3 2014 Form 8-K.

, the Q3 2014 Form 10-Q misleadingly did not address the First *Qui Tam* Action or the Consumer Class Action.  The Q3 2014 Form 10-Q further did not address any concerns that the MicroCool gowns did not adequately protect users against dangerous and life-threatening pathogens causing disease, and thus required a lower AAMI rating than Level 4.  Instead, the Q3 2014 Form 10-Q erroneously stated that Halyard's products are safe and effective based on a "significant body of clinical evidence."  The Q3 2014 Form 10-Q stated:

> Halyard Health, Inc. is a global business which seeks to advance health and healthcare by preventing infection, eliminating pain and speeding recovery.  Our products and solutions are designed to address some of today's most important

---

9

healthcare needs, namely ***preventing infections*** and reducing the use of narcotics while helping patients move from surgery to recovery. ***We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence.***

84.     The Q3 2014 Form 10-Q contained certifications pursuant to sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX") that the Quarterly Report fully complied with Rules 13a-14(a) and 15d-14(a) of the Exchange Act. Defendants Abernathy and Voskuil certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

85.



86.     On March 4, 2015, Halyard filed a Current Report on Form 8-K with the SEC announcing the financial and operating results for the fourth fiscal quarter and fiscal year ended December 31, 2014 (the "FY 2014 Form 8-K"). For the fiscal year, Halyard reported net sales of $1.14 billion for its S&IP segment, compared to net sales of $1.15 billion for 2013, a decrease of 2%.

87.     On March 13, 2015, Halyard filed its Annual Report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2014 (the "2014 Form 10-K"). Defendants Abernathy, Voskuil, Blackford, Byrnes, Dollens, O'Leary, Sainz, and Shimer signed the 2014 Form 10-K. The 2014 Form 10-K reiterated the financial and operating results previously

---

10

announced in the FY 2014 Form 8-K. ████████████████████████████████ ████████████████████████████████████, the 2014 Form 10-K misleadingly did not address the two *Qui Tam* Actions or the Consumer Class Action pending.  The 2014 Form 10-K also did not address any concerns that the MicroCool gowns did not adequately protect users against dangerous and life-threatening pathogens causing disease, and thus required a lower AAMI rating than Level 4.  Instead, the Individual Defendants misleadingly affirmed that "[w]e market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence."

88.     The Individual Defendants stated in the 2014 Form 10-K:

Our products and solutions are designed to address some of today's most important healthcare needs, namely preventing infections and reducing the use of narcotics while helping patients move from surgery to recovery.  We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence.

\* \* \*

In our S&IP business, we are focused on maintaining our market position by providing innovative customer-preferred product enhancements, with a particular focus on the operating room.  Leveraging customer insights and our vertically integrated manufacturing capabilities, we seek to continuously improve our product designs, specifications and features to deliver cost efficiencies while improving healthcare worker and patient protection.

89.     Based on the lack of Board documents provided in plaintiff's inspection demand, the Board had no basis to make this affirmation.  Despite ongoing litigation that demonstrated that the MicroCool gowns did not adequately protect users against dangerous and life-threatening pathogens causing disease, the Board did not meet to discuss the safety of its products like the MicroCool gowns or even addressed any of these ongoing issues in the 2014 Form 10-K.

90.     The 2014 Form 10-K contained certifications pursuant SOX that the Quarterly Report fully complied with Rules 13a-14(a) and 15d-14(a) of the Exchange Act.  Defendants

Abernathy and Voskuil certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

91.     A week later, 

92.     On May 4, 2015, Halyard filed a Current Report on Form 8-K with the SEC announcing the financial and operating results for the first fiscal quarter ended March 31, 2015 (the "Q1 2015 Form 8-K").  For the first fiscal quarter, Halyard reported net sales of $254.8 million for its S&IP segment, compared to net sales of $275.5 million for the same period in the prior year, a decrease of 7.5%.

93.     On May 5, 2015, Halyard filed a Quarterly Report on Form 10-Q with the SEC for the first fiscal quarter ended March 31, 2015 (the "Q1 2015 Form 10-Q").  Defendants Abernathy and Voskuil signed the Q1 2015 Form 10-Q.  The Q1 2015 Form 10-Q reiterated the financial and operating results previously announced in the Q1 2015 Form 8-K.  ███████████

███████████████████████████████████████████████████████████████,

the Q1 2015 Form 10-Q misleadingly did not discuss the two *Qui Tam* Actions or the Consumer Class Action.  The Q1 2015 Form 10-Q further did not address any concerns that the MicroCool gowns did not adequately protect users against dangerous and life-threatening pathogens causing

---

[11] ████████████████████████████████████████████████████

disease, and thus required a lower AAMI rating than Level 4.  Instead, the Q1 2015 Form 10-Q

erroneously stated that Halyard's products are safe and effective based on a "significant body of

clinical evidence."  The Q1 2015 Form 10-Q stated:

> Our products and solutions are designed to address some of today's most important healthcare needs, namely ***preventing infections*** and reducing the use of narcotics while helping patients move from surgery to recovery.  ***We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence***.

94.     The Q1 2015 Form 10-Q contained certifications pursuant SOX that the Quarterly

Report fully complied with Rules 13a-14(a) and 15d-14(a) of the Exchange Act.  Defendants

Abernathy and Voskuil certified that the report did not "contain any untrue statement of a

material fact or omit to state a material fact necessary to make the statements made, in light of

the circumstances under which such statements were made, not misleading with respect to the

period covered by this report."

95.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

96.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ 12

97.    On August 4, 2015, Halyard filed a Current Report on Form 8-K with the SEC announcing the financial and operating results for the second fiscal quarter ended June 30, 2015 (the "Q2 2015 Form 8-K").  For the second fiscal quarter, Halyard reported net sales of $255.3 million for its S&IP segment, compared to net sales of $285.5 million for the same period in the prior year, a decrease of 10.6%.

98.    On August 12, 2015, Halyard filed a Quarterly Report on Form 10-Q with the SEC for the second fiscal quarter ended June 30, 2015 (the "Q2 2015 Form 10-Q").  Defendant Voskuil signed the Q2 2015 Form 10-Q.  The Q2 2015 Form 10-Q reiterated the financial and operating results previously announced in the Q2 2015 Form 8-K.  The Q2 2015 Form 10-Q finally addresses the First *Qui Tam* Action and the VA OIG investigation and subpoena.  ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████, the Q2 2015 Form 10-Q misleadingly did not discuss the Consumer Class Action or the Second *Qui Tam* Action.  The Q2 2015 Form 10-Q further did not address any concerns that the MicroCool gowns did not adequately protect users against dangerous and life-threatening pathogens causing disease, and thus required a lower AAMI rating than Level 4.  Instead, the Q2 2015 Form 10-Q erroneously stated that Halyard's products are safe and effective based on a "significant body of clinical evidence."   The Q2 2015 Form 10-Q stated:

---

12 ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

Our products and solutions are designed to address some of today's most important healthcare needs, namely ***preventing infections*** and reducing the use of narcotics while helping patients move from surgery to recovery. ***We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence***.

99.     The Q2 2015 Form 10-Q contained certifications pursuant SOX that the Quarterly Report fully complied with Rules 13a-14(a) and 15d-14(a) of the Exchange Act. Defendants Abernathy and Voskuil certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

100.



101.

102.     On November 3, 2015, Halyard filed a Current Report on Form 8-K with the SEC announcing the financial and operating results for the third fiscal quarter ended September 30, 2015 (the "Q3 2015 Form 8-K"). For the third fiscal quarter, Halyard reported net sales of

$257.4 million for its S&IP segment, compared to net sales of $279.2 million for the same period in the prior year, a decrease of 7.8%.

103.    On November 4, 2015, Halyard filed a Quarterly Report on Form 10-Q with the SEC for the third fiscal quarter ended September 30, 2015 (the "Q3 2015 Form 10-Q"). Defendant Voskuil signed the Q3 2015 Form 10-Q.  The Q3 2015 Form 10-Q reiterated the financial and operating results previously announced in the Q2 2015 Form 8-K.  The Q3 2015 Form 10-Q did not address any concerns that the MicroCool gowns did not adequately protect users against dangerous and life-threatening pathogens causing disease, and thus required a lower AAMI rating than Level 4.  Instead, the Q3 2015 Form 10-Q stated that Halyard's products are safe and effective based on a "significant body of clinical evidence."   The Q2 2015 Form 10-Q stated:

> Our products and solutions are designed to address some of today's most important healthcare needs, namely ***preventing infections*** and reducing the use of narcotics while helping patients move from surgery to recovery.  ***We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence***.

104.    The Q3 2015 Form 10-Q contained certifications pursuant SOX that the Quarterly Report fully complied with Rules 13a-14(a) and 15d-14(a) of the Exchange Act.  Defendants Abernathy and Voskuil certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

105.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



106.

107.

[14]

108.     On February 29, 2016, Halyard filed a Current Report on Form 8-K with the SEC announcing the financial and operating results for the fourth fiscal quarter and fiscal year ended December 31, 2015 (the "FY 2015 Form 8-K").  For the fiscal year, Halyard reported net sales of $1.03 billion for its S&IP segment, compared to net sales of $1.14 billion in 2014, a decrease of 9.6%.

---

[14]



109.    On February 29, 2016, Halyard filed its Annual Report on Form 10-K with the SEC for the fourth fiscal quarter and fiscal year ended December 31, 2015 (the "2015 Form 10-K").  Defendants Abernathy, Voskuil, Blackford, Byrnes, Dollens, O'Leary, Sainz, and Shimer signed the 2015 Form 10-K.  The 2015 Form 10-K reiterated the financial and operating results previously announced in the FY 2015 Form 8-K.  ████████████████████████████

████████████████████████████████████████████

████████████████████████  The 2015 Form 10-K once again did not discuss that the MicroCool gowns required a lower AAMI rating based on concerns that the gowns did not adequately protect users against dangerous and life-threatening pathogens causing disease. Instead, the Individual Defendants affirmed that "[w]e market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence."

110.    The Individual Defendants stated in the 2015 Form 10-K:

Our products and solutions are designed to address some of today's most important healthcare needs, namely preventing infections and reducing the use of narcotics while helping patients move from surgery to recovery.  We market and support the efficacy, safety, and economic benefit of our products with a significant body of clinical evidence.

*   *   *

In our S&IP business, we are focused on maintaining our market position by providing innovative customer-preferred product enhancements, with a particular focus on the operating room.  Leveraging customer insights and our vertically integrated manufacturing capabilities, we seek to continuously improve our product designs, specifications and features to deliver cost efficiencies while improving healthcare worker and patient protection. We continuously refresh our surgical drape and gown portfolio to ensure that our products are aligned with the latest procedural and market trends.  Our research team works with healthcare providers to develop and design exam glove and apparel portfolios that optimize comfort and fit and provide cost-effective infection prevention solutions for use throughout the hospital.

111.    The 2015 Form 10-K contained certifications pursuant SOX that the Quarterly Report fully complied with Rules 13a-14(a) and 15d-14(a) of the Exchange Act.  Defendants

Abernathy and Voskuil certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

## THE FALSE AND MATERIALLY MISLEADING 2016 PROXY

112.    On March 11, 2016, defendants Abernathy, Voskuil, Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer caused Halyard to file with the SEC its 2016 Proxy on Form DEF 14A in connection with the 2016 Annual Meeting of Stockholders, held on April 28, 2016.   Defendants Abernathy, Voskuil, Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer negligently issued materially misleading statements with respect to these solicited votes.   Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.   Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

**Material Misstatements in Support of Reelecting Defendants Byrnes, Sainz, and Shimer**

113.    In the 2016 Proxy, defendants Abernathy, Voskuil, Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer solicited votes to reelect defendants Byrnes, Sainz, and Shimer.   In support of their bid to reelect these directors, defendants Abernathy, Voskuil, Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer highlighted their supposed successful oversight of the Company.   In particular, the 2016 Proxy described their responsibilities, the duties of each committee, and touted Halyard and the Board's belief that "it is important to uphold sound governance practices."   Additionally, the 2016 Proxy incorrectly claimed that: (i) the Board was engaged in active risk oversight of the Company, including

focusing on the risk in the Company's operations; (ii) the Audit Committee exercised oversight of the financial statements; (iii) the Governance Committee monitored risks relating to governance matters and certain compliance matters and recommended appropriate actions in response to those risks; and (iv) Halyard's financial statements were accurate, and therefore appropriate for the Board's approval in the Company's Annual Report.  The 2016 Proxy stated:

**Board and Management Roles in Risk Oversight**

The Board is responsible for providing risk oversight with respect to our operations. In connection with this oversight, the Board particularly focuses on our strategic and operational risks, as well as related risk mitigation.  In addition, the Board reviews and oversees management's response to key risks facing the Company.

The Board's committees review particular risk areas to assist the Board in its overall risk oversight of the Company:

The Audit Committee oversees our risk management program, with a particular focus on our internal controls, financial statement integrity and fraud risks, and related risk mitigation.  In connection with this oversight, the Audit Committee receives regular reports from management on risk assessments, the risk management process, and issues related to the risks of managing our business. The Audit Committee also receives an annual enterprise risk management update, which discusses our key financial, strategic, operational and compliance risks.

\* \* \*

The Governance Committee monitors risks relating to governance matters … [and] certain compliance matters and recommends appropriate actions in response to those risks.

Complementing the Board's overall risk oversight, our senior executive team identifies and monitors key enterprise-wide and business unit risks, providing the basis for the Board's risk review and oversight process.  Our senior management team is supported by management members from core business units and from our finance, treasury, information technology, global risk management, compliance and legal functions.  Management identifies significant risks for review and updates our policies for risk management in areas such as hedging, foreign currency and country risks, product liability, property and casualty risks, and supplier and customer risks.  The Board believes the allocation of risk management responsibilities described above supplements the Board's leadership structure by allocating risk areas to an appropriate committee for oversight, allows

for an orderly escalation of issues as necessary, and helps the Board satisfy its risk oversight responsibilities.

114.   Through these statements, defendants Abernathy, Voskuil, Blackford, Byrnes, Dollens, Hawkins, Kunz, O'Leary, Sainz, and Shimer's statements misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices.  In reality, as revealed in documents obtained through plaintiff's inspection demand (discussed below), the Board and Audit Committee did not exercise active and appropriate oversight over the Company's corporate governance, risk management, and financial statements.  Rather, after being repeatedly alerted to the MicroCool gowns' failures, these Board members allowed the sale of the product with the improper marketing to continue.  Defendants Abernathy, Voskuil, Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer were negligent in including these misleading statements in the 2016 Proxy.

115.   Defendants Abernathy, Voskuil, Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer made these material misrepresentations above in the 2016 Proxy in support of a stockholder vote for reelecting defendants Byrnes, Sainz, and Shimer to the Board.  Numerous stockholders voted in favor of their reelection based on material misrepresentations about the Company's supposed sound corporate governance and risk management.  This harmed stockholders by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  Therefore, the 2016 Proxy solicitation was an "essential link" in the accomplishment of the harm-causing conduct.

**Material Misstatements in Support of a Vote to Approve the Material Terms of the Performance Goals Under Halyard's Equity Participation Plan**

116.    Defendants Abernathy, Voskuil, Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer also made material misrepresentations in the 2016 Proxy in support of a stockholder vote for approval of the material terms of the performance goals under Halyard's Equity Participation Plan (the "Equity Plan").  The Equity Plan sought to reserve for issuance 4.5 million shares to be issued pursuant to options, stock appreciation rights, restricted shares, restricted share units, performance awards settled in stock, and other stock-based awards settled in stock.  The annual and long-term compensation awards were subject to annual and long-term performance goals, including the performance of Halyard's revenue, sales, margins, profit, earnings, income, stock price or performance, market share or position, and total stockholder return, among others.   In soliciting stockholder vote to adopt these new provisions and performance goals, defendants Abernathy, Voskuil, Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer misleadingly assured stockholders that the provisions were "consistent with the interests of our stockholders and sound governance practices."   This mirrored defendants Abernathy, Voskuil, Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer assertions made earlier in the 2016 Proxy that the Board believed that "it is important to uphold sound governance practices."   As explained above, these assertions were misleading because it provided stockholders with the false impression that the defendants had exercised active and appropriate oversight over the Company's corporate governance.

117.    The material terms of the performance goals in Halyard's Equity Plan did not encourage sound governance practices, nor advanced long-term stockholder value.  In reality, the material terms of the performance goals in Halyard's Equity Plan actually encouraged—and consistently rewarded—extreme risk-taking and widespread illegal practices, which furthered

only short-term growth fueled by artificially inflated sales numbers due to the marketing and sale of defective products while rewarding executives overseeing such endeavors.

118.    Particularly, Halyard incentivized Company fiduciaries to push sales of the MicroCool gowns when demand was at its peak during the Ebola crisis by setting revenue and profit targets linked to the material terms of the performance goals in the Equity Plan. Defendants knew or should have known that executives had breached their fiduciary duties to the Company and exposed the Company to significant and material risks and liability through their conduct related to marketing and sale of defective MicroCool surgical gowns.   Numerous Halyard stockholders voted for the material terms of the performance goals in Halyard's Equity Plan that benefited various officers, including defendants Abernathy and Voskuil.

119.    This vote was made based on material misrepresentations about the Company's supposed sound corporate governance that caused stockholders to vote for material terms of the performance goals in Halyard's Equity Plan that reserved for issuance 4.5 million shares in Halyard.  In reality, the Equity Plan only incentivized the continued risk-taking, illegal, and loss-generating corporate action described herein.  The proxy solicitation for a stockholder vote on the material terms of the performance goals in Halyard's Equity Plan directly authorized this stockholder harm.  Therefore, the 2016 Proxy was an "essential link" in the accomplishment of the harm-causing conduct.

## THE TRUTH EMERGES ABOUT MICROCOOL GOWNS

120.    Eventually, the increased scrutiny over the Company's illegal practices became the subject of national attention.  On May 1, 2016, the CBS television show *60 Minutes* ran a story detailing the illegal activity occurring at Halyard.  The *60 Minutes* report relied on an inside source at Halyard who stated that the MicroCool gowns were susceptible to infiltration

and thus were not effective as protection against diseases like Ebola. In the nationally broadcasted interview with *60 Minutes*, Bernard Vezeau ("Vezeau"), the global strategic marketing director for the MicroCool gowns, stated that "the company went into high gear to sell the product" despite knowing that "the gowns were not consistently meeting industry standards." Additionally, the *60 Minutes* investigators said that at hospitals like UF Health in Jacksonville, they found surgeons who said they repeatedly experienced strike-through.

121.    Vezeau explained during the *60 Minutes* broadcast that some surgeons were so upset that they took pictures of their bloody arms and gowns and sent them to the Company. Vezeau said in addition to strike-through, users complained of ties and sleeves falling off during procedures.  Vezeau told *60 Minutes* that Halyard executives were not concerned about these problems even after Vezeau and other surgeons complained.

122.    The *60 Minutes* story provided even more damaging information about the Company.  The report revealed that 77% of the MicroCool gowns tested failed an independent test conducted in December 2012 by Cardinal Health.  The report also highlighted the February and March 2013 tests and laboratory reports, requested by Kimberly-Clark, which found that 21% of the MicroCool gowns that were tested failed. Moreover, the results could have been even worse, but some of the MicroCool gowns "weren't even tested because the sleeves were so bad."

123.    Further, the *60 Minutes* report also discussed an internal Halyard PowerPoint presentation from November 2014 "that identifie[d] a year-and-a-half 'gap in sleeve seams passing' the industry test."  Incredibly, Halyard's COO, defendant Lowery, acknowledged having seen the shocking results but that evidently did not compel him or anyone else in the Company from recalling the MicroCool gowns or warning the public about them.

124.    On this news, Halyard's market capitalization plunged more than 14%, or $4.55 per share, on May 2, 2016, to close at $26.95 per share compared to the trading day's closing on April 28, 2016 of $31.50 per share, erasing $212 million in market capitalization after the *60 Minutes* report was broadcasted.  Overall, the Company's share price plummeted $23.46 per share, from a high of $50.41 per share on April 8, 2015, amidst affirmations regarding the safety and efficacy of the MicroCool gowns, to $26.95 per share after the *60 Minutes* report was disseminated to the public on May 2, 2016.  This marked a staggering $1 billion market capitalization loss in little over a year, or 46.4% of its value.

125.    A DOJ investigation soon followed in the wake of the *60 Minutes* broadcast.  The DOJ served subpoenas on the Company in May 2016, and again in April 2017, in connection with the design, manufacture, testing, sale, and promotion of the MicroCool gowns and other surgical gowns.

126.    On September 14, 2016, a securities class action was filed on behalf of Halyard stockholder, *Jackson v. Halyard Health, Inc. et al.*, No. 1:16-cv-05093 (S.D.N.Y. 2016), alleging violations of sections 10(b) and 20(a) of the Exchange Act and Securities Act, as well as violations of sections 11 and 15 of the Securities Act and Item 303 of Regulation S-K for false and misleading statements related to the MicroCool gowns.

127.    In May 2017, a jury returned a verdict for the plaintiff in the Consumer Class Action, finding that Halyard had committed fraud in its marketing of the MicroCool gowns and that Halyard and Kimberly-Clark were required to pay ***$454 million***.  To make matters worse, Kimberly-Clark is now seeking indemnification from Halyard for the full amount ($350 million) that it has to pay to the plaintiff.

128.    Another consumer filed a class action against Halyard entitled *Medline Industries, Inc. v. Kimberly-Clark Corporation, Halyard Health, Inc., et al.*, No. 1:17-cv-02032 (N.D. Ga.), on November 17, 2016.  This class action asserts causes of action under federal and state false advertising laws and state unfair competition laws similar to the Consumer Class Action. Halyard is likewise subject to an indemnification obligation with Kimberly-Clark in the *Medline* case.

## REASONS THE STATEMENTS WERE IMPROPER

129.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    that Halyard's MicroCool gowns consistently failed effectiveness tests and various industry standards for safety;

(b)    that the Company received frequent complaints regarding the safety and efficacy of the MicroCool gowns, including major litigation and federal investigations concerning the marketing, sales, and quality of the MicroCool gowns;

(c)    that Halyard fiduciaries, and its predecessor Kimberly-Clark, knowingly marketed, sold, and distributed defective MicroCool surgical gowns amidst an ongoing, international Ebola crisis;

(d)    that as a result, the Company lacked effective oversight over the quality of its products,  internal controls over its financial reporting, adequate disclosure controls and procedures, or sound governance practices; and

(e)    as a result of the foregoing, the officers' and directors' representations concerning the Company's business, prospects, and financial standing were improper.

**DEFENDANT ABERNATHY UNDULY <u>COMPENSATED</u>
<u>DESPITE WRONGDOING</u>**

130.    On June 23, 2017, Halyard announced in a press release that its CEO, defendant
Abernathy, would retire effective June 26, 2017.  The Company also reported the election of
nondefendant Joseph F. Woody ("Woody") to serve as the new CEO and Chairman of the Board.
Despite his participation in the wrongdoing described herein, the Company compensated
defendant Abernathy generously upon his retirement.  Pursuant to Halyard's most recent Proxy
Statement on Form DEF 14A, filed March 10, 2017, with the SEC, defendant Abernathy
received a cash payment of $1,400,091 and equity with accelerated vesting of $2,413,144,
totaling $3,813,235.

## <u>DAMAGES TO HALYARD</u>

131.    As a result of the Individual Defendants' improprieties, Halyard marketed and
sold defective MicroCool gowns during the international Ebola crisis. During the relevant period,
Halyard's fiduciaries disseminated improper, public statements concerning their safety and
efficacy despite ongoing consumer and securities class actions and *qui tam* lawsuits, as well as
ongoing VA OIG and DOJ investigations.  This false and misleading statements and material
omissions provided the public, including investors, with a false and inflated impression of the
Company's business prospects and operations.   These improper statements have devastated
Halyard's credibility as reflected by the Company's more than $1 billion, or 46.4%, market
capitalization loss.

132.    Halyard's performance issues also damaged its reputation within the business
community and in the capital markets.  In addition to price, Halyard's current and potential
customers consider a company's trustworthiness, stability, and ability to accurately describe its
business operation and risk, including legal and regulatory risk.  Customers, including those in

the healthcare industry, are less likely to use the Company's products if they are associated with unlawful marketing and sales designed to conceal issues with safety and efficacy.  Government authorities may seek to prohibit or limit the sale of the Company's products or impose civil and criminal penalties when a violation is found, especially when the health and safety of its users are unnecessarily jeopardized in the name of profit.  As evidence, the VA OIG and DOJ have commenced extensive investigations into the Company's unlawful business practices.  Halyard's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, Halyard stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to Halyard.

133.    Further, as a direct and proximate result of the Individual Defendants' actions, Halyard has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement or any indemnification in consumer class actions, which have already resulted in hundreds of millions of dollars in damages to the Company, *qui tam* actions for violations of the Federal False Claims Act, and the class action for violations of federal securities laws;

(b)    costs incurred from the VA OIG and DOJ, or any internal, investigations; and

(c)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Halyard.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

134.    Plaintiff brings this action derivatively in the right and for the benefit of Halyard to redress injuries suffered, and to be suffered, by Halyard as a direct result of violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Halyard is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

135.    Plaintiff will adequately and fairly represent the interests of Halyard in enforcing and prosecuting its rights.

136.    Plaintiff was a stockholder of Halyard at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Halyard stockholder.

137.    The current Board of Halyard consists of the following nine individuals: defendants Blackford, Byrnes, Dollens, Hawkins, Kunz, O'Leary, Sainz, Shimer, and nondefendant Woody.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Blackford, Byrnes, Dollens, Hawkins, Kunz, O'Leary, Sainz, and Shimer Face a Substantial Likelihood of Liability for Their Misconduct**

138.    As alleged above, defendants Blackford, Byrnes, Dollens, Hawkins, Kunz, O'Leary, Sainz, and Shimer breached their fiduciary duties of loyalty by making improper statements in Halyard's press releases and SEC filings regarding Halyard's ongoing issues with its MicroCool gowns.  Further, based on the books and records obtained through plaintiff's inspection demand pursuant Section 220, defendants Blackford, Byrnes, Dollens, Hawkins,

Kunz, O'Leary, Sainz, and Shimer ignored, recklessly disregarded, or failed to address the illegal

marketing and sale of defective MicroCool gowns. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████      In violation of their duty of loyalty, defendants Blackford, Byrnes, Dollens,

Hawkins, Kunz, O'Leary, Sainz, and Shimer failed to address or investigate the wrongdoing

described herein, which continued unabated throughout the relevant period.

139.    Defendants Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer are

responsible for the negligently made statements in the materially misleading 2016 Proxy.  It is

against public policy to indemnify individuals for violations of section 14(a) of the Exchange

Act.   Accordingly, an indemnification provided by the Company to defendants Blackford,

Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer does not protect them for violations of

section 14(a) in the 2016 Proxy.  Accordingly, defendants Blackford, Byrnes, Dollens, Hawkins,

O'Leary, Sainz, and Shimer face a substantial likelihood of liability, excusing a demand.

140.    Defendants Blackford, Kunz, and O'Leary, as members of the Audit Committee,

reviewed and approved the improper statements and earnings guidance.  The Audit Committee's

Charter provides that it is responsible for compliance with accounting, legal, and regulatory

requirements.   Thus, the Audit Committee Defendants were responsible for knowingly or

recklessly allowing the improper statements related to the Halyard's earnings guidance and

financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and

approved the improper press releases made to the public. ████████████████

████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████        Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.   Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

141.    Defendants Byrnes, Hawkins, Sainz, and Shimer, as members of the Compliance Committee, were charged with monitoring, discussing, and evaluating issues "relating to the Corporation's compliance with applicable laws and regulations throughout the world ("Compliance") other than those relating to matters reserved for the Audit Committee," and "matters relating to sustainability, corporate social responsibilities and corporate citizenship." Despite their knowledge or reckless disregard, the Compliance Committee Defendants caused or allowed the continued illegal marketing and sale of defective MicroCool gowns in the face of failed testing conducted by independent laboratories.  Thus, defendants Byrnes, Hawkins, Sainz, and Shimer face a substantial likelihood of liability for their failure to prevent the continued manufacture, marketing, and sale of defective MicroCool gowns and their breach of fiduciary duties so any demand upon them is futile.

**Demand Is Excused as to Nondefendant Woody Because He Lacks Independence**

142.    The principal professional occupation of nondefendant Woody is his employment with Halyard, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.   Accordingly, nondefendant Woody lacks

independence from defendants Blackford, Byrnes, Dollens, Hawkins, Kunz, O'Leary, Sainz, and Shimer due to his interest in maintaining his executive position at Halyard.  This lack of independence renders nondefendant Woody incapable of impartially considering a demand to commence and vigorously prosecute this action.

143.    Plaintiff has not made any demand on the other stockholders of Halyard to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Halyard is a publicly held company with over 46.8 million shares outstanding and thousands of stockholders as of October 25, 2017;

(b)    making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## TOLLING OF THE STATUTE OF LIMITATIONS

144.    Plaintiff had neither actual nor constructive knowledge of the facts constituting their claims for relief until recently.

145.    Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the claims alleged herein until recently, including, most importantly the requisite *mens rea* of the Individual Defendants for the claims detailed herein.

146.    Because Halyard affirmatively concealed its illegal marketing and sales practices, and the Board's knowledge or reckless disregard thereof, plaintiff had no knowledge until recently of the alleged improper activities or information which would have caused a reasonably

diligent person to investigate whether Halyard committed the actionable activities detailed herein.

147.    Upon learning of possible wrongdoing by Company fiduciaries, the plaintiff diligently pursued his right as a stockholder to inspect Halyard's books and records under Section 220.  The books and records provided by the inspection demand were necessary and essential to determine if and to what extent wrongdoing actually occurred.  Notably, the Company did not finish its production, ████████████████████████ until January 18, 2018.

148.    Through plaintiff's inspection demand, ████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████ the Individual Defendants ignored, recklessly disregarded, or failed to address or investigate the illegal marketing and sale of defective MicroCool gowns during the relevant period.  Further, ██████████ ████████████████████████████████████ ████████████████████████

149.    Upon his discovery of this previously concealed wrongdoing found in the course of his Section 220 inspection demand, plaintiff promptly filed this lawsuit within the statutory period.  As a result of Halyard's active concealment, the running of the statute of limitations has been tolled with respect to any claims that plaintiff has as a result of the unlawful conduct alleged in this complaint.

## COUNT I

**Against Defendants Abernathy, Voskuil, Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer of Section 14(a) of the Exchange Act**

150.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.   The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants Abernathy, Voskuil, Lowery, Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer.  The section 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

152.   Defendants Abernathy, Voskuil, Lowery, Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were contained in the 2016 Proxy.  The 2016 Proxy contained proposals to the Company's stockholders that they vote to reelect the members of the Board.  The 2016 Proxy, however, misrepresented and failed to disclose and explain that: (i) that Halyard's MicroCool gowns consistently failed effectiveness tests and various industry standards for safety; (ii) that the Company received frequent complaints regarding the safety and efficacy of the MicroCool gowns, including major litigation proceedings and federal investigations concerning the marketing, sales, and quality of the MicroCool gowns; (iii) that Halyard fiduciaries, and its predecessor Kimberly-Clark, knowingly marketed, sold, and distributed defective MicroCool gowns amidst an ongoing, international Ebola crisis; and (iv) that as a result, the Company lacked effective oversight over the quality of its products,  internal controls over its financial reporting, adequate disclosure controls and procedures, or sound governance practices.  By

reasons of the conduct alleged herein, defendants Abernathy, Voskuil, Blackford, Byrnes, Dollens, Hawkins, 'Leary, Sainz, and Shimer violated section 14(a) of the Exchange Act.  As a direct and proximate result of these violations, stockholders voted in favor of reelecting defendants Abernathy, Dollens, Hawkins, Blackford, Byrnes, O'Leary, Sainz, and Shimer to the Board.  Defendants Abernathy, Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer's reelection led to the continuation of the wrongful practices described herein.

153.    Plaintiff, on behalf of Depomed, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants Abernathy, Blackford, Byrnes, Dollens, Hawkins, O'Leary, Sainz, and Shimer based upon the false and misleading 2016 Proxy, and also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

154.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

155.    The Individual Defendants owed and owe Halyard fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Halyard the highest obligation of good faith, fair dealing, loyalty, and due care.

156.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Halyard, and/or consciously failing to prevent Halyard from engaging in the unlawful acts complained of herein.

157.    The Officer Defendants, defendants Abernathy, Voskuil, and Lowery either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) that Halyard's MicroCool surgical gowns consistently failed effectiveness tests and various industry standards for safety; (ii) that the Company received frequent complaints regarding the safety and efficacy of the MicroCool surgical gowns, including major litigation proceedings and federal investigations concerning the marketing, sales, and quality of the MicroCool surgical gowns; (iii) that Halyard fiduciaries, and its predecessor Kimberly-Clark, knowingly marketed, sold, and distributed defective MicroCool surgical gowns amidst an ongoing, international Ebola crisis; and (iv) that as a result, the Company lacked effective oversight over the quality of its products,  internal controls over its financial reporting, adequate disclosure controls and procedures, or sound governance practices.   Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

158.    Director Defendants, defendants Abernathy, Blackford, Byrnes, Dollens, Hawkins, Kunz, O'Leary, Sainz, and Shimer, as directors of Halyard, owed Halyard the highest duty of loyalty.   These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning the illegal marketing and sale of defective MicroCool gowns. Defendants Blackford, Byrnes, Dollens, Hawkins, Kunz, O'Leary, Sainz, and Shimer knew or were reckless in not knowing that: (i) that Halyard's MicroCool gowns consistently failed effectiveness tests and various industry standards for safety; (ii) that the Company received frequent complaints regarding the safety and efficacy of the MicroCool gowns, including major litigation proceedings and federal investigations concerning the marketing, sales, and quality of the MicroCool gowns; (iii) that Halyard fiduciaries, and its predecessor Kimberly-Clark,

knowingly marketed, sold, and distributed defective MicroCool gowns amidst an ongoing, international Ebola crisis; and (iv) that as a result, the Company lacked effective oversight over the quality of its products, internal controls over its financial reporting, adequate disclosure controls and procedures, or sound governance practices. Accordingly, defendants Abernathy, Blackford, Byrnes, Dollens, Hawkins, Kunz, O'Leary, Sainz, and Shimer breached their duty of loyalty to Halyard.

159. The Audit Committee Defendants, defendants Blackford, Kunz, and O'Leary, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and defendants Blackford, Kunz, and O'Leary failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

160. The Compliance Committee Defendants, defendants Byrnes, Hawkins, Sainz, and Shimer, were charged with monitoring, discussing, and evaluating issues "relating to the Corporation's compliance with applicable laws and regulations throughout the world ("Compliance") other than those relating to matters reserved for the Audit Committee," and "matters relating to sustainability, corporate social responsibilities and corporate citizenship." Even in the face of failed testing revealing defective design and manufacture of MicroCool gowns, the Compliance Committee Defendants continued to allow the dissemination of improper statements about the safety and efficacy of the gowns, which they knew or were reckless in not knowing contained improper statements and omissions.

161. As a direct and proximate result of the Individual Defendants' breaches of their

fiduciary obligations, Halyard has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to Halyard.

162.    Plaintiff, on behalf of Halyard, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

163.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

164.    As a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings were accurate, Halyard is subject to a securities class action lawsuit.  Further, the Company is now subject to consumer class actions, which has resulted in jury award of $454 million, *qui tam* actions, and the ongoing investigations led by the VA OIG and DOJ, related to the illegal conduct and wrongdoing described herein. The Individual Defendants have caused Halyard to waste its assets by forcing it to defend itself in the ongoing litigation and cooperate in the ongoing investigations, in addition to any ensuing costs from a potential settlement, adverse judgement, or criminal penalties.

165.    In addition, Halyard by failing to conduct proper supervision, the Individual Defendants have caused Halyard to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

166.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

167.    Plaintiff, on behalf of Halyard, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

168.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

169.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Halyard.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Halyard.  This includes defendant Abernathy, who unjustly received $3.8 million in total severance and retirement compensation including cash payments and equity with accelerated vesting.

170.    Plaintiff, as a stockholder and representative of Halyard, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

171.    Plaintiff, on behalf of Halyard, has no adequate remedy at law.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, plaintiff, on behalf of Halyard, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, and violations of securities law;

B.    Directing Halyard to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Halyard and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be

necessary to place before stockholders for a vote of the following Corporate Governance Policies:

   1. a proposal to strengthen the Company's control over its marketing and sales practices;

   2. a proposal to strengthen the Halyard's controls over financial reporting;

   3. a proposal to strengthen Halyard's oversight of its disclosure procedures;

   4. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

   5. a provision to permit the stockholders of Halyard to nominate at least three candidates for election to the Board.

  C. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Halyard has an effective remedy;

  D. Awarding to Halyard restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

  E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

  F. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

February 21, 2018

**COOCH AND TAYLOR, P. A.**

*/s/ Blake A. Bennett*
Blake A. Bennett #5133
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
Telephone: (302) 984-3889
Facsimile: (302) 984-3939
E-mail: bbennett@coochtaylor.com
*Attorneys for Plaintiff*

**OF COUNSEL**
ROBBINS ARROYO LLP
BRIAN J. ROBBINS
GEORGE C. AGUILAR
STEVEN M. MCKANY
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
       gaguilar@robbinsarroyo.com
       smckany@robbinsarroyo.com

1239243